**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| LELAND MEDICAL CENTERS, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | CASE NO. 4:07cv67 |
| v. | § | |
| | § | |
| FLOYD R. WEISS, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER REGARDING DEFENDANTS' MOTIONS TO STRIKE DANIEL JACKSON

A number of motions have been filed by Defendants challenging the expert report and testimony of Plaintiff's expert, Daniel Jackson (Dkts. 212, 219, 224, and 281). The parties request that the Court exercise its broad discretion under *Daubert* and Federal Rule of Evidence 702 to determine whether Jackson's opinions are reliable and supported.

### STANDARD

An expert's testimony must be reliable at each and every step or else it is inadmissible. "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F. 3d 347, 355 (5th Cir. 2007) (quoting *Heller v. Shaw Indus. Inc.*, 167 F.3d 146,155 (3rd Cir. 1999).

Federal Rule of Civil Procedure 702 in part provides that a qualified expert may testify in order to assist the trier of fact to understand the evidence or to determine a fact in issue if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles

1

and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. FED. R. EVID. 702. When evaluating expert testimony, the overarching concern is whether or not it is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed.2d 469 (1993).

In general, a copyright infringer is liable for either statutory damages or the copyright owner's actual damages and any additional profits of the infringer. 17 U.S.C. § 504(a). "The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Actual damages are the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement. 4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright,* § 14.02, at 4-14 (2005); *see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 772 F.2d 505, 512 (9th Cir. 1985).

As to profits, the statute provides further "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). For the purposes of 17 U.S.C. § 504(b), "gross revenues" include only "gross revenues reasonably related to the infringement, not unrelated revenues." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2nd Cir. 2001). Speculation should play no role in determining the amount of actual damages sustained. *See Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 470 (2nd Cir. 1985).

2

"Gross revenue," as defined in 17 U.S.C. § 504(b), "does not mean the infringer's gross revenue from all of its commercial endeavors." *Nelson-Salabes, Inc. v. Morningside Dev., LLC,* 284 F.3d 505, 511 n.9 (4th Cir. 2002). Instead, "a copyright owner is only entitled to present the gross revenue for the infringer's line of business or project related to the infringement." *Id.* The copyright holder must establish the existence of a causal link between the infringement and the infringer's gross revenue before the burden-shifting provisions of § 504(b) will apply. *Bonner v. Dawson,* 404 F.3d 290, 294 (4th Cir. 2005). Failure to require a causal link is nothing more than allowing expression of any "pie in the sky" damage model. *See generally Polar Bear Productions, Inc. v. Timex*, 384 F.3d 700 (9th Cir. 2004).

### JACKSON'S PROFIT ANALYSIS

Jackson's report sets forth his opinions on actual damages as well as profits. Profit (loss of profit) damages must be established with "reasonable certainty." *Tex. Instruments Incorp. v. Teletron Energy Mgmt.*, 877 S.W.2d 276, 281 (Tex. 1994). Such damages may not be based on evidence that is speculative, uncertain, contingent, or hypothetical. *Carter v. Steverson & Co.*, 106 S.W.3d 161, 165-66 (Tex. App.– Houston [1st Dist.] 2003, pet. denied). A plaintiff must adduce evidence from which the jury can reasonably estimate the amount. *Davis v. Small Bus. Inv. Co.,* 535 S.W.2d 740, 743 (Tex. Civ. App.– Texarkana 1976, writ ref'd n.r.e.). While some uncertainty as to the amount of damages is permissible, uncertainty as to the fact of damages will defeat recovery. *Id.* In this case, since there are no gross revenues generated by the Bariatric Hospital, Jackson has opined that an acceptable measure of recovery is in effect an anticipated revenue stream based on Bariatric's pro forma projections.

3

The genesis of this controversy is one piece of paper depicting a design.  According to Jackson this one piece of paper translates into a multi-million dollar damage award.  According to Jackson's report, total damages represent a 15 to 30 fold increase in any profit for any hospital that Leland has ever been associated with, taking into consideration, license fees, management fees and profit participation.  Naturally, all Defendants challenge the methodology.

Jackson's analysis as to "disgorgement of profits" begins with the concession that the hospital has never generated gross revenues.  He uses a "2006 Budget" for the hospital prepared by Foundation as his starting point.  Jackson states that gross revenues are projected to be approximately $50,000,000; collected revenues of $30,000,000 after "deductions"; and earnings before interest, taxes, depreciation and amortization in excess of $10,000,000.  He states that, each succeeding year, the hospital would most likely generate at least these levels of revenues and profits.

Jackson states that he performed two analyses in trying to reach an opinion as to fair market value.  He states that when gross revenue will be recognized in the future, courts have relied upon the fair market value of the property as the most appropriate "proxy for gross revenues."  He cites two cases, evidently provided by counsel for this analysis.  In *Van Bouck & Associates v. Darmik, Inc.*, 329 F. Supp. 2d 924 (E.D. Mich. 2004), the court awarded actual damages and profit damages to the copyright claimant.  Interestingly, the case cited by Jackson finds that the actual damages should have been the amount the architect would have charged the infringers for the design.  As to the award of profits, the court applied a fair market value test to the *residence* to determine the appropriate gross revenue when the house had not been sold.

4

Without commenting on whether the test meets the reasonable certainty test, the court notes that there was evidence from appraisers as to offers for the house as well as the listing price. Whether such evidence is even admissible as to fair market value need not be addressed for the purposes of this order.  As a general rule in Texas, unaccepted offers to purchase are not competent evidence of fair market value.  *Hanks v. Gulf Colo. & S.F. Ry.*, 320 S.W.2d 333, 336 (Tex. 1959).  However, *Van Bouck* does not support Jackson's methodology or conclusions as to market value.  It doesn't even come close.  Determining market value of real estate is far less conjectural than projecting the value of a business not yet operating with no facility and no revenue.

Jackson also cites *Associated Residential Design, LLC v. Moloky,* 226 F. Supp.2d 1251 (D. Nev. 2002).  In that case, the home owners were the infringers of Associated's design.  However, the home had not been sold.  The court held that profits recoverable under § 504(b) can be divided into two categories: direct and indirect.  *Id.; see also Mackie v. Rieser,* 296 F.3d 909, 914 (9th Cir. 2002).  The court held that even though direct profits could not be demonstrated, Associated could sue for indirect profits.  *Associated,* 226 F. Supp.2d at1255.  The court held indirect profits involve "revenue that has a more attenuated nexus to the infringement."  *Id.*  (citing *Mackie,* 296 F.3d at 914).  The court further noted that although indirect profits may be recovered by a copyright holder, those claims are frequently unsuccessful because profits must be "attributable to the infringement." *Id.* (citing § 504(b); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.03[A] (2002) (explaining that, "[i]t does not suffice for a plaintiff to imagine *fantastic success*, if only the defendant had not gotten in the way") (emphasis added)).  "(A) copyright holder must proffer sufficient non-speculative evidence to support a causal relationship between the infringement and

the profits generated indirectly from such an infringement." *Id.* (citing *Mackie*, 296 F.3d at 915-16). The court noted "(a)lthough the Molotkys have not sold their home, it is possible that they have 'profited' from its construction.  That is, the value of the home could be greater than the cost to build it.  In this sense, the Molotkys may have realized revenue from the construction of the home.  We believe that this view is in line with Congress' intent in drafting § 504(b)." *Id.* at 1256.

     *Associated* does not support Jackson's methodology or conclusions.  Other courts have also required that the plaintiff demonstrate a nexus between infringement and indirect profits. *See, e.g., Mackie,* 712 F.2d at 915; *Univ. of Colo. Found. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1375 (Fed. Cir. 1999) (holding that the plaintiff has the "burden" to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur); *Bus. Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399, 404 (2nd Cir. 1989) (holding that a plaintiff can recover indirect profits in the form of "value received from an infringing product used to enhance commercial reputation" if it first demonstrates that "the amount of an award is based on a factual basis rather than undue speculation") (internal quotation marks omitted); *see also Estate of Vane v. The Fair, Inc.,* 849 F.2d 186, 189-90 (5th Cir. 1988) (affirming district court's refusal to award indirect profits damages allegedly resulting from infringing use of photographic slides in advertising); *cf. Taylor v. Meirick,* 712 F.2d 1112, 1122 (7th Cir. 1983) (noting in direct profits context that "[i]f General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.").

When financial records sufficiently detailed to show an infringer's sales are not available, expert testimony may be used to develop either such proof or, as Leland attempted, proof of profits, rather than sales.  But it is the trial court's role to evaluate this testimony.  *Vane,* 849 F.2d at186. In *Vane*, the Fifth Circuit noted that the expert's testimony was flawed because the expert's loss of profit calculation did not account for that portion in the calculation that was attributable to the infringing matter.  *Id.*  Where a business is not established, Texas precedent has long taken a dim view of trying to determine profits.  *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (Tex. 1938).  Companies are free to create speculative, optimistic, and conjectural projections and to rely upon them in making business decisions.  However, the mere existence of similar projections created by a company other than the plaintiff does not obviate the need for courts to apply the "reasonable certainty" test, nor does it indicate conformity with this legal standard.  *See generally Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.,* 207 S.W.2d 801 (Tex. App.– Houston (14th Dist.) 2006, pet. denied).

Here Jackson's "Field of Dreams" analysis seems to be premised on the concept of build it and they will come.  Yet, he fails to account for revenue not attributable to the hospital design.  In fact, he wrongly concludes that it is the Defendants' burden to figure out what revenue is attributable to the infringing act.  The plaintiff has the burden to demonstrate a nexus between the infringement and indirect profits.  *See Straus v. DVC Worldwide, Inc.,* 484 F. Supp.2d 620 (S.D. Tex. 2007). According to his report all revenue no matter how generated should be taken into account as indicia of profits.  Therefore, revenue from physician charges, pathology studies, room charges, lab fees, x-ray charges, MRI or CT scan studies, meals, needles, glucose, anesthesia, medicines, gowns,

disposable diapers, foot protectors, and surgical supplies – to name a few – all are attributable to Leland's creative design. Adopting Jackson's methodology is tantamount to holding that people who come to the bariatric hospital do so for the design, not to get rid of excess fat. His report in most respects is pure conjecture and speculation, so much so that the analysis should stop here. However, read on.

In Texas, courts have long favored the comparable sales approach when determining the market value of real estate property. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001); *United States v. 320.0 Acres of Land,* 605 F.2d 762, 798 (5th Cir. 1979). Although many cases arise in the context of a condemnation, the approach in appraising a property to determine value for a loan or collateral is no different than that of a condemnation. Under this approach, "[c]omparable sales must be voluntary, and should take place near in time to the condemnation, occur in the vicinity of the condemned property, and involve land with similar characteristics." *City of Harlingen,* 48 S.W.3d at 182; *see also United States v. Trout,* 386 F.2d 216, 223 (5th Cir. 1967). Furthermore, "[c]omparable sales need not be in the immediate vicinity of the subject land, so long as they meet the test of similarity." *City of Harlingen,* 48 S.W.3d at 182. Finally, "if the comparison is so attenuated that the appraiser and the fact-finder cannot make valid adjustments for these differences, a court should refuse to admit the sale as comparable." *Id.*; *see also Kraft,* 77 S.W.3d at 808.

Although Jackson's resume is long and presumptively impressive, it contains no information which demonstrates that he has any certification or experience in determining market value of real property. The two cases noted in his report which he uses to support his market value theory involve

a determination of market value of real property, not business value.  Somehow he extrapolates the holdings in these two cases to support his proposition that business value using a market approach is also appropriate.  He states that he has calculated the fair market value of the hospital.  However, his calculation totally fails to use comparable property analysis or any other accepted real property appraisal technique.  He then goes on to state that (to) determine the fair market value of an operating entity it is necessary to perform a valuation of that business enterprise.  Of course, all agree that the hospital is not an operating entity.

Throughout his analysis, Jackson continues to mix "apples and oranges" in his assessment. Although he acknowledges in a market business analysis that the proper approach is to look at comparable properties, his analysis looks at two "primary data sources."  He first cites The Hospital M&A Market: Five Year Review& Outlook.  Then he states that he downloaded all transactions available through Capital IQ which fall into the industry groups of Specialty Hospitals.  From this, he extrapolates "reasonable multiples" for the bariatric hospital.  From this, he determines an implied valuation in the range of 30.2 million to 73.7 million.  Again, there is no indication of what comparable he examined, if at all.  In the end analysis, the Fifth Circuit has cautioned against the very approach that Jackson has used.  Any damage model based on speculative revenues and operating profit from an unbuilt facility, is in an of itself, inherently speculative.  *Carbo Ceramics, Inc. v. Keefe*, 166 Fed. Appx. 714 (5th Cir. 2006) (citing *Metallurgical Industries, Inc. v. Fourtek, Inc.*, 790 F.2d 1195 (5th Cir. 1986)).

The income approach to value proceeds on the premise that a buyer of income-producing property is primarily interested in the income its property will generate.  *Polk County v. Tenneco,*

*Inc.,* 554 S.W.2d 918, 921 (Tex. 1977).  The income method involves estimating the future income of the property and applying a capitalization rate to that income to determine market value.  *Id.; City of Dallas v. Redbird Dev. Corp.,* 143 S.W.3d 375, 384 (Tex. App.– Dallas 2004, no pet.).  The capitalization rate is the rate of interest investors would require as a return on their money before they would invest in the income-producing property, taking into account all the risks involved in that particular enterprise.  *City of Dallas,* 143 S.W.3d at 384.

Jackson's "income approach" analysis is flawed primarily for the reasons noted above.  All revenues are attributed to the infringement of Leland's design.  He first notes that the Foundation Defendants have not produced as much information as he would have hoped to analyze.  He also notes that he has only one year of cash flow projections.  He selects a discount rate of 22% but provides no analysis except in an annotation to his chart of the components of this rate.  His testimony is simply speculative, conjectural, and his methodology is flawed throughout.

An analysis of the hospital's real property value after completion minus construction costs is, in the Court's opinion, the proper manner to determine the type of profits Leland seeks when gross revenues are not available.  *See Christopher Phelps & Associates, LLC v. Galloway,* 492 F.3d 532 (4th Cir. 2007).[1]  Jackson's testimony as to the fair market value of the hospital (for profit analysis) whether utilizing his "income analysis or his market analysis" is stricken.

As to the remainder of Jackson's opinions as to gross revenue, the Court finds that his opinion does not assist the jury.  There appears to be little dispute as to the gross revenues received

---

[1]This case as well as the *Van Brough* and *Associated* cases provide a blueprint of how to determine profits in real property when property has not been sold.  One need not be an architect to understand the design.

by Huffman and Studio 5G.  Presumably, Leland has admissible evidence of gross revenues. Jackson does not attempt to apportion the revenues but merely states that lost profits equal the total gross revenue to Huffman and Studio 5G.  His testimony is not necessary on a matter not in dispute. This does not mean that Jackson cannot testify in rebuttal should Huffman and Studio 5G present evidence as to gross revenues which were not fairly disclosed in discovery or are significantly lower than what was previously anticipated by all parties.

## ACTUAL DAMAGES

Actual damages are measured by "the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement." *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.,* 807 F.2d 1110, 1118 (2nd Cir. 1986) (citation omitted). In appropriate circumstances, actual damages may be taken to be a reasonable license fee, that is, the fair market value of a license authorizing the defendant's use of the copyrighted work. *See On Davis v. Gap, Inc.,* 246 F.3d 152, 164-68 (2nd Cir. 2001).  This measure of damages contemplates "a negotiation between a willing buyer and a willing seller" and does not depend on whether the copyright infringer was *in fact* willing to negotiate for a license.  *Id.* at 172.  Rather, "[an] honest purchaser is hypothesized solely as a tool for determining the fair market value of what was illegally taken."  *Id.  See also Thoroughbred Software Intern., Inc. v. Dice Corp.*, 488 F.3d 352 (6th Cir. 2007).  Actual damages are generally calculated with reference to the loss in the fair market value of the copyright, often measured by the profits lost as a result of the infringement.  *See, e.g., Eales v. Envtl. Lifestyles, Inc.,* 958 F.2d 876, 880 (9th Cir. 1992), *cert. denied,* 506 U.S. 1001, 113 S. Ct. 605, 121 L. Ed.2d 541 (1992); *see generally* 3 *Nimmer* § 14.02[A], at 14-8 to 14-9.

According to Jackson, the appropriate measure of Leland's actual damages is the "royalty test" or "market value test."  Jackson does not rely on the royalty test because Leland has not licensed any third party to use its floor plan design in "isolation."  Jackson does concede that Leland provided a one-time floor design to Erdman & Associates in return for a licensing fee of $180,000. However, Jackson states that this fee was also in addition to other remunerations that Leland expected to receive from development fees and management fees.  Jackson notes another fee of $75,000 for the Physician's Metroplex hospital design.  Jackson mentions that there were other agreements associated with this license but does not specify the other agreements.  Jackson also refers to the Trophy Club Physician's Hospital but states that the proposed fee never came to fruition. Jackson states that none of the license fees quoted are representative since Leland's modus operandi was to secure other benefits which were potentially more lucrative.  However, Jackson's analysis is short sighted.

The question is not what Leland would have charged, just as it is not relevant what Foundation would have paid.  The inquiry is an objective one into the resultant fair market value after negotiation between a willing buyer and seller.  *Country Road Music, Inc. v. MP3.com, Inc.*, 279 F. Supp.2d 325 (S.D.N.Y. 2003).  For Jackson to discount this approach because Leland would not license without obtaining other financial incentives applies a subjective test, not an objective one.

Jackson claims that the market value test is the best method to measure Leland's damages. It is Leland's burden to demonstrate that his design had a fair market value. *On Davis v. The Gap, Inc.,* 246 F.3d at 166.  However, mathematical precision is not required.  *Stevens Linen Assocs. v. Mastercraft Corp.,* 656 F.2d 11, 14 (2nd Cir. 1981).  Although the Act itself does not define what

constitutes actual damages, the primary measure of recovery is the extent to which the market value of the copyrighted work at the time of infringement has been injured or destroyed by the infringement.  Failure to apply this measure in weighing actual damages is error.  *See generally Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110 (2nd Cir. 1986).  Although courts allow an appropriate license fee to be taken into consideration on the issue of market value, this Court has found no cases to support what Jackson purports to do.  Jackson appears to base his damage number of $750,000 to $1,250,000 on four factors: the financial incentives necessary to entice Leland to dispose of his interest in the West Texas hospital; the anticipated fees Leland would have earned on proposed projects; the efficiency in the design; and the anticipated profits to be earned by the Foundation defendants.

As to the category "Financial Incentives to Dispose of Leland's Interest," the Court finds that this is not part of the actual damage rubric contemplated by the Act.  What Leland would hope to earn as a profit interest in some other hospital bears no relationship to the market value diminution or injury to his single page schematic of a hospital.  To argue that this is an element for consideration in actual damages circumvents the Copyright Act.  *See generally Barrera v. Brooklyn Music, Ltd.*, 346 F. Supp.2d 400 (S.D.N.Y. 2004).  As to "fees," Jackson takes into consideration Leland's desired profit participation in a hospital as well as Leland's desire to receive compensation as a manager of the hospital.  These factors have nothing to do with the disputed copyright design.  What was said concerning the first factor applies to this factor as well.

The Court finds that the efficiency of design consideration has some merit in analyzing the market value of the design.  However, it is impossible from the report to comprehend what portion

13

of the actual market value is attributable to efficiency.

As to Foundation's "profits," the Court finds that such is merely speculative.  In any event, Jackson has not demonstrated how Foundation's profits translate into his actual damage number.  Nor has he provided any assurances that these profits were not taken into account in his profit analysis.  If these profits are part and parcel of his disgorged profit analysis, then Leland is to some extent "double dipping" on the damages.  Jackson appears to be doing exactly what 17 U.S.C. Section 504(b) proscribes.

Moreover, Jackson's testimony practically strips Leland of any causation claim.  Leland has the burden to show that, but for Foundation's infringement, it would not have suffered a loss.  *Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994).  As Jackson notes, Leland and Foundation are essentially competitors.  Leland would not have furnished its design without a right to participate in some level in profits as well as management.  According to Jackson, Leland would not have participated in this hospital nor would Foundation have hired Leland on the terms Leland usually sought.  At least many of the factors considered by Jackson in Leland's previous design and build experience would never have to come to fruition on this project.  The Court finds that Jackson's testimony is not reliable and merely speculative as to actual damages and should be accordingly stricken.

Defendants' various motions to strike (Dkts. 212, 219, 224, and 281) are therefore granted.

**SO ORDERED.**

 **SIGNED this 27th day of September, 2007.**


DON D. BUSH
UNITED STATES MAGISTRATE JUDGE